UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| JESSICA H. EDGE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:18-cv-00167-TWP-DML |
| | ) | |
| BOARD OF SCHOOL TRUSTEES OF THE | ) | |
| SALEM COMMUNITY SCHOOL | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY FOLLOWING DAMAGES HEARING

This matter is before the Court on a Verified Petition for Itemized Damages filed by

Plaintiff Jessica H. Edge ("Edge") (Filing No. 71).  A hearing was held on January 29, 2021 (*see*

Filing No. 75).  The Court now issues a ruling.

## I.    BACKGROUND

After she was terminated from her teaching position following FMLA leave, Edge sued

her employer, Defendant Board of School Trustees of the Salem Community School Corporation

(the "Board") (*see* Filing No. 1). On cross motions for summary judgment, the Court ruled in favor

of and in opposition to both parties (Filing No. 68).  Specifically, Edge's Motion for Summary

Judgment, (Filing No. 52), was **granted** as to Count I – Interference with FMLA Rights, Count II

– Retaliation for Exercising FMLA Rights, and Count IV – Petition for Judicial Review Pursuant

to Ind. Code § 4-21.5-5-14 and **denied** as to Count III – Violation of Substantive Due Process

Rights.  In turn, the Board's cross-Motion for Summary Judgment, (Filing No. 47), was **denied** as

to Count I, Count II, and Count IV and **granted** as to Count III.  (Filing No. 68 at 17.)  However,

because Edge's Complaint alleged only "categories of damages," the Court ordered her "to submit

an itemized accounting of her requested damages," which she timely filed.  *Id.*; *see* Filing No. 71.
The Board responded in opposition, (Filing No. 72).  In her reply in support, (Filing No. 73), Edge,
among other things, submitted updated damages and requested the Court set the matter for a
hearing consistent with the summary judgment Entry's direction, which it did, (*see* Filing No. 74),
and which was held on January 29, 2020, (*see* Filing No. 75).  Following the hearing, Edge again
provided "updated amounts of attorney's fees and costs." (*See* Filing No. 76.)

## II.   ITEMIZED DAMAGES

Edge, in addition to attorneys' fees and associated costs discussed at the end of this Section,
seeks the following damages, discussed in the pertinent Subsections below:

| | |
|---|---|
| Back Wages | $116,338.84 plus interest |
| Retirement Benefits | $3,520.52 plus interest |
| Welfare Benefits Plan ("VEBA") | $586.82 plus interest |
| Retirement Savings 401(a) Annuity | $1,760.39 plus interest |
| Interest | 6% on $122,206.57 |
| Liquidated damages | $134,066.22 |
| Three years front pay and benefits | $166,539.48 |
| Total | $545,018.84 |

(*See generally* Filing No. 71).

### A.   Back Wages

"An employee may be entitled to back pay . . . as a remedy for losses from flowing from
an employer's substantive rights under the FMLA." *Franzen v. Ellis Corp.*, 543 F.3d 420, 426 (7th
Cir. 2008). But an employer may avoid the accrual of back pay in FMLA cases by showing that
the plaintiff "failed to mitigate [her] damages by seeking alternate employment." *Id.* at 426, 429–
30. *See also Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1202 (7th Cir. 1989) ("[A]

discharged employee must mitigate damages by using 'reasonable diligence in finding other suitable employment.'") (quoting *Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 231 (1982)) (emphasis omitted). In other words, "the familiar common law duty of mitigating damages is imposed: the employee must make a diligent search for comparable employment," even when discharged illegally. *Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 771 (7th Cir. 2006). The burden of proving lack of mitigation is on the employer. *E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1581 (7th Cir. 1997). Moreover, the Seventh Circuit has emphasized that, to prevail on a failure to mitigate defense, the employer must prove "*both* that the [plaintiff was] not reasonably diligent in seeking other employment, *and* that with the exercise of reasonable diligence there was a reasonable chance that [she] might have found comparable employment." *E.E.O.C. v. Gurnee Inn Corp.*, 914 F.2d 815, 818 (7th Cir. 1990) (quotation omitted) (emphasis in original). The "obligation of reasonableness within [a plaintiff's] duty to mitigate requires: (1) the seeking of comparable work, but (2) if none is available, then (3) the seeking of reasonable alternative work." *Snow v. HealthSouth Corp.*, No. IP00-0151 CMS, 2001 WL 395124, at *28 (S.D. Ind. Mar. 21, 2001).

Edge argues that she is entitled to back wages totaling $116,338.84 plus interest (Filing No. 71 at 5–6). At the time her contract was cancelled on August 13, 2018, Edge's yearly salary was $52,469.74 (2018–19 school year). *Id.* at 5. The next year, she was set to receive a $200.00 raise under a collective bargaining agreement, making her 2019–20 school year salary $52,669.74. *Id.* The year after that, she was set to receive an additional raise in that same amount, creating a 2020–21 school year salary of $52,869.74. *Id.* So, as of the time of the filing of this Petition, Edge argues she was owed back wages totaling $116,338.84: $50,451.67 for the remainder of 2018–19; $52,669.74 for all of 2019–20; and $13,217.43 for 2020–21 to date at time of filing. *Id.* at 5–6.

In response, the Board argues that Edge did not mitigate her damages when she "failed to reasonably seek comparable employment." (Filing No. 72 at 1.) In fact, Edge "did not start looking for new employment until January 2019, more than four (4) months after her employment with the School ended," and "[a]s of May 2019, Ms. Edge had only applied for one job". *Id.* at 2. "[J]ob postings maintained by the Indiana Department of Education," however, "show that there have been over 60 teaching positions posted in the geographic area surrounding Salem Community School Corporation since August 2018." *Id.* Because she did not reasonably attempt to mitigate her damages, Edge "is not entitled to back pay or, in the alternative, her back pay award should be limited to no more than six (6) months," which is "no more than $26,487.10 for back pay and benefits [which are discussed below]." *Id.* at 3.

In reply, Edge argues that she "has applied for, submitted her resume for and/or inquired about a total of 91 positions" since January 2019 (and 23 positions as of February 27, 2019), fulfilling her obligation to mitigate her damages (Filing No. 73 at 3). And as for the job openings provided by the Board, "most of these schools are ***not*** in the same geographic area as Edge," which makes them untenable following her husband's job change. *Id.* (emphasis in original).

Edge did not look into obtaining new employment from the time she was terminated on August 13, 2018 until January 2019 (Filing No. 49-1). When pressed for her rationale as to why she waited five months to start looking for a new job, Edge responded that there was "no particular reason other than I was taking care of my mom." *Id.* And when she did start looking in the winter and spring of 2019, she constrained her search to teaching positions (save for applying to one part-time church secretary position) and did not actually submit any application materials for teacher roles "because there were no openings." *Id.* at 112, 113. Acknowledging that "[t]he best time to find a job is usually like late spring" or "during the summer months," Edge augmented her search

starting in June 2019. *Id.* at 115; *see* Filing No. 73-2.  Over the course of that June, July, and August, Edge inquired over the telephone about seventeen positions and submitted a resume and letter of interest to fourteen more. *Id.*  But to no avail (Filing No. 73-1 at 1).  And from September 2019 to August 2020, Edge called about twenty-one jobs and submitted a resume and letter of interest for fifteen positions (*see* Filing No. 73-3).  Edge affirmed that, as of November 20, 2020, she has had no success in finding employment (or even obtaining an interview) despite having "applied for, inquired about and/or submitted resumes for at least 91 jobs." *Id.* at 2.

Taking into account the unique aspects of the K–12 school hiring cycle, the Court finds it reasonable for Edge to focus her search for comparable employment starting in late spring and early summer 2019. But when nothing panned out after that hiring cycle concluded in August, it was time for Edge to seek reasonable alternative employment. *See Snow*, 2001 WL 395124, at *28.  The Court agrees with the Board that a period of six additional months serves as a "more than reasonable amount of time during which she could have obtained . . . reasonable alternative employment." (Filing No. 72 at 3.)  With this in mind, the Court finds that Edge is entitled to back pay for her 2018–19 salary and for six months (or half) of her 2019–2020 salary, representing the reasonable time in which she could have sought a comparable teaching job and, when that search proved fruitless, additional time to seek an alternative position.  Because Edge continued to apply for teaching jobs during this period, the Court finds that she sufficiently mitigated her damages through that time. Thus, Edge is owed back wages totaling $76,786.54: $50,451.67 for the remainder of the 2018–19 school year and $26,334.87 for half her 2019–2020 salary.

**B.**   **Retirement Benefits**

Edge argues she is entitled to lost retirement benefits totaling $3,520.52 plus interest (Filing No. 71 at 6). At the time she was terminated, the Board contributed 3% of Edge's salary to her

Teacher's Retirement Fund.  *Id.*  In 2018–19, this amount was $60.54 per pay period; in 2019–20, this amount was set to be $60.77 per pay period; in 2020–21, this amount was set to be $61.00 per pay period.  *Id.*  So, for the twenty-five pay periods that remained in 2018–2019, the Board would have contributed $1,513.50; for 2019–20, $1,580.02; and for 2020–21, $427.00 (as of the time of the filing); all for a total of $3,520.52 plus interest.  *Id.*

Consistent with the above holding, the Court finds that Edge is entitled to lost retirement benefits totaling $2,303.51: $1,513.50 for the remainder of 2018–2019 and $790.01 for half of 2019–20.

**C.      Welfare Benefits Plan Benefits ("VEBA")**

Edge contends that she is owed $586.82 plus interest in lost VEBA benefits (Filing No. 71 at 7).  At the time of her termination, the Board contributed 0.5% of Edge's salary to Edge's VEBA account. *Id.* In 2018–19, this amount was $10.09 per pay period; in 2019–20, this amount was set to be $10.13 per pay period; in 2020–21, this amount was set to be $10.17 per pay period. *Id.* So, for the twenty-five pay periods that remained in 2018–2019, the Board would have contributed $252.25; for 2019–20, $263.38; and for 2020–21, $71.19 (as of the time of the filing); all for a total of $586.82 plus interest.  *Id.*

As above, the Court determines Edge is entitled to lost VEBA benefits totaling $383.94: $252.25 for the remainder of 2018–19 and $131.69 for half of 2019–20.

**D.      Retirement Savings 401(a) Annuity**

Edge contends that she is owed $1,760.39 in lost 401(a) Annuity benefits (see Filing No. 71 at 7–8). At the time of her termination, the Board contributed 1.5% of Edge's salary to her annuity.  *Id.* at 7.  In 2018–19, this amount was $30.27 per pay period; in 2019–20, this amount was set to be $30.39 per pay period; in 2020–21, this amount was set to be $30.50 per pay period.

*Id.* at 7–8.  So, for the twenty-five pay periods that remained in 2018–2019, the Board would have contributed $756.75; for 2019–20, $790.14; and for 2020–21, $213.50 (as of the time of the filing); all for a total of $1,760.39 plus interest.  *Id.* at 8.

Congruent with the previous sections, Edge is entitled to lost 401(a) Annuity benefits totaling $1,151.82: $756.75 for the remainder of 2018–19 and $395.07 for half of 2019–20.

## E.  **Interest**

Edge argues that she is owed 6% interest on her calculated damages of $122,206.57. (Filing No. 71 at 8.)  Though the Board does not challenge that Edge is entitled to interest on these damages, the Court must adjust both factors.  First, as discussed above, Edge is owed a total $80,625.81 of damages subject to receipt of interest under the FMLA (back wages totaling $76,786.54, retirement benefits totaling $2,303.51, VEBA benefits totaling $383.94, and 401(a) Annuity benefits totaling $1,151.82). *See* 29 U.S.C. § 2617(a)(1)(A)(ii). And, upon the Court's review, the 6% interest rate provided by Edge exceeds the average prevailing prime rate suitable for this calculation between the time she was terminated and the entry of judgment. *See First Nat. Bank of Chicago v. Standard Bank & Tr.*, 172 F.3d 472, 480 (7th Cir. 1999) ("Our practice has been to use the prime rate as the benchmark for prejudgment interest . . . .").  Though the current prime rate rests at 3.25%, *see* www.federalreserve.gov/releases/h15, "the best starting point is to award interest at the market rate, which means an *average* of the prime rate for the years in question." *Cement Div., Nat. Gypsum Co. v. City of Milwaukee*, 31 F.3d 581, 587 (7th Cir. 1994), *aff'd*, 515 U.S. 189 (1995) (emphasis added). For the pertinent period – from August 2018 to now – the average prime interest rate lands at 4.50%. *See* https://fred.stlouisfed.org/series/MPRIME (showing range (averaging 4.50%) from 5.50% to 3.25%).  Accordingly, the Court will award prejudgment interest on the above award of $80,625.81 at a rate of 4.50% interest from August 13,

2018 (the date of Edge's termination), to the date of judgment, compounded monthly. *See Rasic v. City of Northlake*, No. 08 C 104, 2010 WL 3365918, at *12 (N.D. Ill. Aug. 24, 2010) (determining that, under the FMLA, "compounding interest on a *monthly basis* is a[n] accurate way to fully compensate a plaintiff for the time value of an increasing amount of lost wages.") (emphasis added).  This interest, so accrued and compounded, amounts to $9,919.59.

## F.    <u>Liquidated damages</u>

The FMLA authorizes district courts to award liquidated, double damages against employers who violate the statute. *See* 29 U.S.C. § 2617(a)(1)(A)(iii). Liquidated damages are "*mandatory* unless the district court finds that the defendant-employer was acting in good faith and reasonably believed that its conduct was consistent with the law." *Shea v. Galaxie Lumber & Constr. Co.*, 152 F.3d 729, 733 (7th Cir. 1998) (emphasis added). "The employer bears a substantial burden in showing that it acted in good faith and with reasonable grounds to believe that its actions did not violate the [statute]." *Bankston v. State of Illinois*, 60 F.3d 1249, 1254 (7th Cir. 1995). The Seventh Circuit has remarked that there is a "strong presumption" in favor of doubling. *Shea*, 152 F.3d at 733; *see also id.* ("Doubling is the norm, not the exception."); *Ryl-Kuchar v. Care Centers, Inc.*, 565 F.3d 1027, 1030 (7th Cir. 2009) ("[T]he district court awarded prejudgment interest and liquidated damages[, ]the norm in FMLA cases.").

Edge argues she is entitled to a liquidated damages award of $134,066.22 (the sum of her calculated above totals) because the Board did not act in good faith when it (1) failed to provide her a Designation Notice; (2) retaliated against her for taking FMLA leave; (3) directed individuals to follow her; and (4) terminated her employment (*see* <u>Filing No. 71 at 8</u>–11; 29 U.S.C. § 2617(a)(1)(A)(iii)).

In response, the Board contends that a "good faith" assessment comes in two parts: "a subjective belief demonstrating 'an honest intention to ascertain what the [FMLA] requires and to act in accordance with it,' and an objective demonstration of reasonable grounds." (Filing No. 72 at 4–5 (quoting *Martin v. U.S.*, 130 Fed.Cl. 578, 585 (2017).) The Board argues it meets both grounds when it

> had an honest subjective belief that it was complying with FMLA when it permitted Ms. Edge to take leave when she requested it, and that it had a valid reason to terminate her employment when she did not return from leave when the School expected and did not substantively respond to communications from the School about her failure to return for approximately six weeks. It was also objectively reasonable for the [Board] to believe that it could terminate the employment of an employee who did not return from leave when expected and did not communicate with the [Board] about her failure to return.

*Id.* at 5. First, "Edge reasonably should have responded to the May 7, 2018 letter if she truly believed that the School was mistaken in its calculation of her FMLA leave." *Id.* Instead, she waited almost a month, until the conclusion of the school year. *Id.* Moreover, "Edge had information as early as March 2, 2018 that the [Board] only anticipated that she would be absent for 60.5 days, which would not take her leave to the end of the school year" when the Board sent her a letter laying out how she would be paid for the remaining days she was not working that school year. *Id.* Though the Board should have sent a Designation Notice, nothing supports that this failure was not done in good faith—"it was nothing other than an inadvertent technical error that resulted in no prejudice to Ms. Edge." *Id.* at 6. As for "monitoring" Edge, the Board "received information that suggested that Ms. Edge was not using FMLA leave for her stated purpose and reasonably investigated the situation." *Id.* at 8. This tracked the suspicions arising from when the "medical certification form Ms. Edge completed for her daughter did not contain necessary information and was penned in Ms. Edge's hand, not the medical provider's," and from when Edge "abruptly and retroactively changed the stated reason for seeking FMLA, namely, to take care of

9

her newborn child (when she had already taken non-FMLA maternity leave earlier in the school year)." *Id.* All told, "Edge's actions are sufficient to provide the School an objectively reasonable basis, an honest suspicion, to believe Ms. Edge was abusing her FMLA leave in an attempt to avoid returning to work under circumstances to which she objected." *Id.* at 9.

In reply, Edge argues that the Board has failed to demonstrate that it acted in good faith (Filing No. 73 at 5). Specifically, Edge contends that the Board echoes three losing arguments from the summary judgment stage. *Id.* First, Edge maintains that the Board's argument that she should have responded to the May 7, 2018 letter was already rejected by the Court. *Id.* Second, Edge maintains that the Board attempts to relitigate that she was not prejudiced by the Board not providing a Designation Notice when, in fact, "she has suffered (and continues to suffer) enormous financial harm." *Id.* at 5–6. Additionally, the Court on summary judgment finding in her favor on the retaliation claim, Edge argues, "is enough to award liquidated damages." *Id.* at 6 (citing *Alcazar-Anselmo v. City of Chicago*, 2011 WL 3236024, *6 (N.D. Ill. 2011) (finding that "the fact that Plaintiff was fired so close to her requested FMLA leave date provided grounds for the jury to rule for Plaintiff on her retaliation claim" and thus, awarded "$89,476.17 [full amount requested] in liquidated damages."). "Finally," Edge concludes, "the SRO … did follow Edge, and she did not just 'run into her' or 'see her in the area of the school.'" *Id.* Moreover, "[o]ther individuals also followed Edge, took photographs and/or videos of her and provided updates to Reed and/or Minton." *Id.*

Even crediting the Board with acting in good faith, it has not sufficiently proven the equally necessary element that it had reasonable grounds to believe that its acts or omissions tracked the FMLA's requirements. The Board states in conclusory fashion that it had "a reasonable basis to believe that the failure to provide a Designation Notice was not a violation of FMLA given that

the failure resulted in no prejudice to Ms. Edge" and that it "had a reasonable basis to believe that FMLA required an employee to report on her intent to return to work and to request additional time if more leave was needed." (Filing No. 72 at 7.)  But the Court has already determined that the Board interfered with Edge's FMLA rights by failing to provide her requisite notices, (Filing No. 68 at 10), and that Edge's decision to take FMLA leave was a "significant factor" in the Board's decision to terminate her employment, *id.* at 14.  These clear violations of the FMLA were not "objectively reasonable." Accordingly, Edge is, as is customary under the FMLA, entitled to liquidated damages equal to the sum of her above damages and compounded prejudgment interest: $90,545.40.

## G.   Front pay and benefits

Edge argues she is entitled to three years front pay totaling $166,539.48 due to her difficulty finding comparable employment despite her due diligence, (Filing No. 71 at 12–13). She contends that this difficulty especially stems from her inability to travel for work "because of a change in her husband's employment" caused by her termination. *Id.*

In response, the Board argues that Edge should not receive front pay because,

using reasonable diligence, [she] should have found comparable employment by now. As demonstrated by job posting information from the Indiana Department of Education, comparable employment is available and a reasonable inference can be made that comparable employment will continue to be available at similar levels. There is simply no reason that it should have taken Ms. Edge this long, let alone three more years to obtain comparable employment.

(Filing No. 72 at 3–4.)

In reply, Edge rejoins that she "is entitled to front pay" because she "continuously attempted to mitigate her damages." (Filing No. 3 at 4.)

Because the Court has limited back pay through January 2020 since Edge failed to seek reasonable alternative employment, *see supra* Subsection II.A., and because the Court has awarded

11

Edge liquidated damages, *see supra* Subsection II.F., it will not award Edge front pay and benefits for an additional three years. *See Shick v. Illinois Dep't of Human Servs.*, 307 F.3d 605, 614 (7th Cir. 2002) ("[F]ront pay is designed to compensate . . . for the reasonable time it would take to find comparable employment elsewhere."); *Downes v. Volkswagen of Am., Inc.*, 41 F.3d 1132, 1141 (7th Cir. 1994) ("In deciding whether to award front pay, the court considers such factors as whether the plaintiff has a reasonable prospect of obtaining comparable employment, whether the time period for the award is relatively short, whether the plaintiff intended to work or was physically capable of working and whether liquidated damages have been awarded.").

**H.**    **Attorneys' Fees and Costs**

Under 29 U.S.C. § 2617(a)(3), the Court "*shall*, in addition to any judgment awarded to the plaintiff, allow a reasonable attorney's fee, reasonable expert witness fees, and other costs of the action to be paid by the defendant." (Emphasis added). "A presumptive award is calculated by multiplying the hourly fees charged by the plaintiffs' attorneys by the number of hours they had worked on the case." *Wink v. Miller Compressing Co.*, 845 F.3d 821, 824 (7th Cir. 2017).

Using this method, Edge argues she was entitled—through October 30, 2020—to $205,010.00 in attorneys' fees and $6,539.78 in costs, (Filing No. 71 at 13–22). "For all of the hours worked, Plaintiff's counsel, Ms. Blevins and Ms. Maddox, seek their current 2020 hourly rates of $595.00 per hour and $495.00 per hour, respectively"; senior associate, Courtney E. Endwright, seeks $395.00 per hour for her services", and "associate, Chad H. Holler, seeks $295.00 per hour for his services." *Id.* at 16.  Not only are these the fees being charged all clients in 2020, but they are reasonable compared to rates charged by like attorneys, as supported by several sworn declarations by notable Indianapolis-area attorneys. *Id.* at 17.  Moreover, all employees in Indiana benefit from this litigation because they "will be protected from employers in Indiana who fail to

provide a required Designation Notice as well as be protected from employers who retaliate against employees for taking FMLA leave." *Id.* at 18. Finally, the lodestar amount should not be adjusted because it would not be "necessary" to determine a reasonable fee. *Id.* "Edge obtained specific and complete relief from the Defendant's interference and retaliation. As a result, her counsel should be fully compensated for their time and expense." *Id.* at 21. Because "the emphasis is on related versus unrelated claims as opposed to successful versus unsuccessful claims," the Court should look to the litigation when all of Edge's claims are interrelated and not necessarily entirely discreet. *Id.* at 21–22. The number of, and details about, the hours billed are notated at Filing No. 71-1 at 9–37. The statement of costs is listed at *id.* at 38–39.

In response, though the Board "concedes that [Edge] is the prevailing party," her "fee request includes hours that were not reasonably expended and is calculated at a rate that is not reasonable." (Filing No. 72 at 9, 10.) Moreover, Edge "did not prevail on all claims and attorney fees are only available for two of the three claims on which Plaintiff did prevail." *Id.* at 10. Altogether, the Board contends that Edge should receive a fee and expense award of no more than $96,810.26. First, though Edge "claims a total of 466 hours expended on this matter", "137 hours should be excluded as not reasonably expended." *Id.* The Board urges that 16.5 hours billed by an attorney and administrative staff should be excluded because they were committed to clerical and non-legal tasks, like scanning and emailing letters. *Id.* at 11–12. Additionally, 25.25 hours should be excluded because the time entries are vague (like drafting "a document") or redundant (like emailing oneself or repeat entries). *Id.* at 12–13. Further, the case was "overstaffed" ("[o]ne partner and one associate was sufficient") and "[c]ounsel spent an excessive amount of time 'conferring' with each other," leading to a need to exclude 22.25 hours. *Id.* at 13-14. Though conferring is not always unreasonable, "the extent to which this occurred is excessive and the

necessity of this time is not supported by the billing records." *Id.* at 14.  The Board also argues that 3.5 hours of travel time should be excluded because Edge could have retained local counsel. *Id.* at 15–16. Additionally, pre-litigation hours should be excluded because "there is simply no requirement that Ms. Edge pursue administrative remedies with the Board before pursuing her FMLA claims (the claims for which fees are available)." *Id.* at 16.  "The events before May 7, 2018 cannot arguably be deemed necessary for bringing Plaintiff's claims in this lawsuit and, therefore, [19.5 hours spent before then] must be excluded." *Id.* at 17. On top of this, because "there was no prerequisite that Ms. Edge had to exhaust the school board administrative proceedings in order to bring her FMLA claims," 96.75 hours (69.5 hours of which are not otherwise excludable for the reasons set forth above) spent between May 8, 2018, and August 13, 2018, should be excluded.  *Id.* at 18.  Further, "expenses should also be reduced by $1,552.86 to a total of $4,986.92" because many of the costs are vague or inappropriate. *Id.* at 19. The rates charged should also be adjusted, argues the Board, to the following more "reasonable" rates: Ms. Maddox's reduced to $350.00 per hour, "Ms. Blevins' and Mr. Betz' [sic] rates should be reduced to no more than $480 per hour" based on adjusted rates obtained by American Civil Liberties Union attorney Kenneth Falk several years ago, "Ms. Endwright's rate should be reduced to $300 per hour, Mr. Holler's rate should be reduced to $275 per hour, and Ms. DeCoursey's rate should be reduced to $200 per hour." *Id.* at 20–21.  All told, "[m]ultiplying reasonable hours by reasonable rates, the lodestar amount in this case should be no more than $108,907.50, plus $4,986.92 for expenses." *Id.* at 21. Finally, because Edge "was successful on her FMLA claims, but not on her Substantive Due Process Claim" and "a fee award is not available on her state law claim for judicial review", "a discount of at least 15% is appropriate." *Id.* at 22. "Applying this discount to the lodestar amount results in a fee and expense award of no more than $96,810.26." *Id.*

14

In reply, Edge argues that she should recover all the fees and costs she originally claimed, (Filing No. 73 at 7–20), and updated her total request—up to November 20, 2020—to $224,840.00. (Filing No. 73-4 at 1.)  First, Edge contends that she should recover fees for staff preparing binders and spreadsheets when those are "organizational and case management skill[s] that paralegals typically perform." *Id.* at 7. Additionally, paralegals (at a lower rate) communicated with Edge to fulfill the ethical requirement of communication on the part of the attorneys.  *Id.* at 8.  Additionally, an error repeated some of Attorney Maddox's hours as a "header" of consecutive pages, but the hours were not duplicated in the total, so those twelve hours should not be excluded.  *Id.* Additionally, twelve hours that were deemed "vague" by the Board were purposefully opaque but have been clarified in the brief to refer to specific documents.  *Id.* at 8–9.  As for other entries that the Board argued should be excluded as vague or in error, the inadvertent mistakes in notation have been clarified in a revised statement of hours and the brief.  *Id.* at 9.  As for the "overstaffing," "Maddox, the most junior partner, and Holler, the most junior associate, performed the vast majority of the work (468 hours or 92.5% of the total hours billed)." *Id.* As for unreasonable "conferring," "considering the complexities of this matter, including a never-before litigated issue of law, as well as the opposition by Defendant, such conferences and teamwork was required." *Id.* at 10.  And any vagueness discussing these conferences was done purposefully to preserve privilege but has been expanded in the briefing.  *Id.* at 10–12.  In regard to "out of town counsel," no local "attorneys represented teachers facing cancellation of their contract, especially against a local school corporation." *Id.* at 13. "Because it was necessary for Edge to hire an attorney in Indianapolis with knowledge of the issues involved in her matter, Maddox's travel time of 3.50 hours on 8/2/2018 should be charged to Defendant." *Id.*  Regarding "pre-litigation fees," "the core of Edge's administrative hearing and her petition for review that followed related to Edge's FMLA

claims." *Id.* For example, "Edge was able to use evidence and/or testimony gathered from the administrative hearing in both of the summary judgment briefings." *Id.* at 14.  Moreover, the Board "fails to present the specific evidence required to reduce Edge's attorneys' fees and merely mentions then wholly ignores the significant evidence presented by Edge that specifically relates to the reasonableness of fees." *Id.* Instead, the Board latches on to a statement from one of the attorneys indicating that she charges less than Maddox, ignoring "not only evidence from Edge's counsel that these are the actual billing rates for Edge's counsel but also 3 other Declarations from prominent attorneys that were submitted by Edge with her fee petition." *Id.* at 16. Moreover, comparisons to other attorneys are misplaced when they work in entirely different settings, and even for not-for-profits (*i.e.*, Attorney Falk).  *Id.* at 17–18.  Additionally, the lodestar amount should not be reduced because "Edge obtained specific and complete relief from Defendant's FMLA interference and retaliation" and "the claims brought by Edge against Defendant are all related to Edge's request for FMLA leave." *Id.*  Finally, as for expenses, Edge clarifies the exact costs she seeks, especially as it relates to use of "vendors" to complete clerical tasks.  *Id.* at 19–20.

Later yet, Edge provided "updated amounts of attorney's fees and costs" accounting for the all other costs after November 20, 2020 (including amounts involving the January 29 hearing), totaling $241,313.75 (see Filing No. 76; Filing No. 76-2 at 1; Filing No. 76-3 at 1.)

At the outset, the Court indicated at the hearing that it would not adjust the rates of pay for the attorneys. First, "attorney's actual billing rate for comparable work is 'presumptively appropriate' to use as the market rate." *People Who Care v. Rockford Board of Education*, 90 F.3d 1307, 1310 (7th Cir. 1996). Because the rates sought by Edge's attorneys in this case are their "actual billing rate[s] for comparable work" (*compare* Filing No. 71-1 at 5, 5–6 (affirming that Attorney Blevins is "currently paid a standard fee of $595.00 an hour" and that clients pay "$395.00

for the work of [ ] senior associate, Courtney E. Endwright, and $295.00 for the work of [ ] associate, Chad H. Holler") *and* <u>Filing No. 71-2 at 3</u> (affirming that Attorney Maddox is "currently paid a standard fee of $495.00 an hour") *with* <u>Filing No. 71 at 16</u> (stating that "Plaintiff's counsel, Ms. Blevins and Ms. Maddox, seek their current 2020 hourly rates of . . . $595.00 per hour and $495.00 per hour, respectively" and that "senior associate, Courtney E. Endwright, seeks $395.00 per hour for her services . . . [and] associate[ ] Chad H. Holler, seeks $295.00 per hour for his services"), the Court presumes that they represent a fair market rate. *See People Who Care*, 90 F.3d at 1310. Moreover, Edge's counsel has adequately supported their contention that these rates are reasonable and within the market rate through the affidavits of local practitioners (*see* <u>Filing No. 71-8 at 3</u>–4. (affidavit affirming that Ms. Blevins and Ms. Maddox's rates are "more than reasonable and commensurate with their level of experience, talent, and knowledge;" and Ms. Endwright and Mr. Holler's rates are "extremely reasonable and justified"); <u>Filing No. 71-5 at 6</u>–7 (affidavit confirming that hourly rates for Betz + Blevins are "more than reasonable and commensurate with their level of experience, skill, talent, knowledge and resources"); <u>Filing No. 71-4 at 4</u> (same); <u>Filing No. 71-6 at 5</u> (affidavit declaring that the "attorneys' fees and expenses of Betz + Blevins in their representation of Jessica H. Edge are both reasonable and necessary.")).

Additionally, any "vague and redundant" entries were sufficiently clarified in Edge's reply brief and accompanying exhibits. For example, one of the purportedly redundant time entries was an inadvertently created header row that did not add to the total with each notation, and another entry mistakenly indicated that an attorney emailed herself instead of a colleague (*compare* <u>Filing No. 71-1 at 10</u>–26 *with* <u>Filing No. 76-2 at 2</u>–19). As for vagueness of entries involving "documents," Edge clarifies the entries while persuasively explaining that some identifying information was initially withheld to maintain privilege (*see* <u>Filing No. 73 at 8</u>–9; <u>Filing No. 76-2</u>

*passim*). The Court further finds that there was no overstaffing in the case. Though the Board complains that "the use of three partners and three associates on this case was excessive," two of the three partners billed a combined total of 19.5 hours and one of the two (not three) associates billed only 1.5 hours (*see* Filing No. 76-2 at 1). Again Court further finds no unnecessary or excessive conferring on the matter. Counsel sufficiently clarified in detail the necessity for these conferences in the reply brief and convincingly described that conferencing was necessary to facilitate communication in the case (*see* Filing No. 73 at 10–12). Finally, the Court will not discount Attorney Maddox's travel time as no attorneys near Edge handled cases like hers and few attorneys in the state have comparably deep experience representing teachers before school boards (*see* Filing No. 73-1 at 2; Filing No. 71-6 at 7–9).

The Court determines that most of the work performed by paralegals—including time preparing for a hearing, compiling binders, creating spreadsheets, and communicating with Edge—will be excluded, as these were clerical and non-legal tasks typically covered as overhead costs by attorney rates. *See People Who Care*, 90 F.3d at 1315 ("The only inquiry for requested paralegal fees should be whether the work was sufficiently complex to justify the efforts of a paralegal, as opposed to an employee at the next rung lower on the pay-scale ladder."); *Spegon v. Catholic Bishop of Chicago*, 175 F.3d 544, 553 (7th Cir. 1999) ("[T]he district court should disallow time spent on what are essentially 'clerical' or secretarial tasks," like "organizing file folders, document preparation, and copying documents."). Specifically, all of Glenda Murphree's entries (totaling $1,278.75) will be excluded: most of them are fifteen-minute entries for emailing "correspondence and/or court documents to client" while the others are dedicated to entering information in a calendar and preparing files and binders (*See* Filing No. 76-2 at 31). Likewise, all of Allyson Utley's charged hours (totaling $950.00) will be excluded as they too are solely

dedicated to clerical tasks, like saving and emailing correspondence and court documents, gathering information, and calendaring dates. *Id.* at 30. Finally, one hour of Abigail DeCoursey's time on August 2, 2018, (totaling $225.00) will be excluded as it was tied to the clerical task of assisting "with preparation for hearing and binders." *Id.* at 27. This adjustment reduces the award by $2,453.75. As for Attorney Maddox's entries challenged by the Board as clerical, however, these disputed 2.75 hours will not be reduced as they are all included as component parts of non-clerical tasks (*see* Filing No. 72 at 11–12; Filing No. 73-4 at 2–18).

Additionally, the Court will exclude all hours expended prior to the Board notifying Edge on May 7, 2018, that it intended to start proceedings to cancel her contract—this time was not reasonably expended for the subsequent litigation. These entries include 0.25 hours for Attorney Blevins ($148.75 total), 0.5 hours for Allyson Utley ($47.50 total), 0.75 hours for Attorney Betz ($468.75), and 21.5 hours for Attorney Maddox ($10,642.50), totaling $11,307.50. Moreover, the Court will exclude all hours spent during the administrative proceedings before the Board. Though Edge argues that some of this work proved *useful* in the later litigation (*see* Filing No. 73 at 14 (noting that "the administrative hearing transcript was cited 40 times in both *Plaintiff's Motion for Summary Judgment* and *Plaintiff's Response to Defendant's Motion for Summary Judgment*"), non-mandatory administrative proceedings are not ordinarily compensable unless they are reasonably expended for purposes of the subsequent litigation and were "both useful and of a type ordinarily necessary to advance the civil rights litigation." *See Webb v. Bd. of Educ. of Dyer Cty., Tenn.*, 471 U.S. 234, 243 (1985). Though hours spent pre-litigation may have been useful for her later case, it was not *necessary* for Edge to exhaust administrative proceedings before advancing her FMLA claim. *See Edwards v. Heatcraft, Inc.*, No. 7:05-CV-36 (HL), 2006 WL 3159945, at *4 (M.D. Ga. Nov. 2, 2006) ("Unlike Title VII and the ADA, there are no administrative prerequisites that must

be satisfied before filing an FMLA suit in federal court."). The Court, then, must exclude 52.50 hours for Attorney Maddox (totaling $25,987.50), 0.25 hours for Attorney Blevins (totaling $148.75), 1.25 hours for Attorney Betz (totaling $781.25), and 17.25 for Attorney Holler (totaling $5,088.75), for a total reduction of $32,006.25 in fees for hours spent on the administrative hearings.  In total, excluded pre-litigation fees amount to $43,313.75 ($11,307.50 accumulated before the Board notified Edge it was going to start the process to cancel her contract and $32,006.25 accrued during the resultant administrative proceedings).

The two hours reductions discussed above—for time spent on clerical and pre-litigation work—total $45,767.50 in decreased fees. Accordingly, the Court finds a lodestar amount of $195,546.25 (the requested $241,313.75 less the excluded $45,767.50).  As for universal adjustments to this amount, the Court, having considered the parties' arguments, determines that it will discount the calculated lodestar total by 15%.  This adjustment recognizes that even though Edge succeeded on the claim, fee awards are unavailable on state law claims for judicial review (*see* Filing No. 72 at 22).  In the United States, the parties to a lawsuit generally bear their own costs of litigation. *See Buckhannon Bd. & Care Home, Inc. v. W. Va. Dept. of Health*, 532 U.S. 598, 602–03 (2001).  This so-called "American rule" presumes that attorney fees are not recoverable as costs or damages, unless specifically allowed by statute, agreement between the parties, or narrow common law exception. *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 448 (2007).  Here, no statute, agreement, or common law exception permits recovery for fees expended in these claims.  But because isolating the amount of time spent on this claim alone is unfeasible, a lodestar adjustment is a suitable means for accounting for this reduction.

20

This adjustment does not, however, incorporate any discount for time spent on Edge's unsuccessful Due Process claim. While "awarding attorney's fees for time spent on unsuccessful claims for relief that are *unrelated* to successful claims" is inappropriate, "time spent on unsuccessful, *related* claims *may* be compensated." *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1279 (7th Cir. 1983) (emphasis in original). "[A]n unsuccessful claim will be *un*related to a successful claim," the Seventh Circuit continued, "when the relief sought on the unsuccessful claim is intended to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury on which the relief granted is premised." *Id.* (emphasis in original). Here, Edge's Due Process claim stemmed from—like her FMLA claims—her request for FMLA leave and the subsequent actions of the Board, (*see* Filing No. 68 at 8–17). More to the point, Edge's Due Process claim and her FMLA claim for retaliation both involved the Board's decision to terminate her; both were premised on a "common core of facts." *Mary Beth G.*, 723 F.2d at 1279. All told, the course of conduct giving rise to Edge's injuries is the same for these successful and unsuccessful claims, *see id.*, and "the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Hensley*, 461 U.S. at 435.

In sum, the Court finds that Edge is owed $166,214.31 in attorneys' fees (85% of $195,546.25). Though this award nearly meets Edge's recovery, "[f]ee-shifting statutes such as § 2617(a)(3) are designed to prevent the potentially high costs of litigation from stifling justified claims." *Cuff v. Trans States Holdings, Inc.*, 768 F.3d 605, 610–11 (7th Cir. 2014) (holding that district court did not abuse its discretion in awarding a plaintiff $325,000.00 in attorneys' fees, even when his FMLA recovery was less than $50,000.00).

As for costs, the Court determines that Edge is entitled to expenses incurred after August 13, 2018 (for the reasons discussed above), plus half of the amount spent in preparing binders for the administrative hearing before the Board.  First, though the Board asks the Court to exclude the $993.17 spent in preparing binders for the hearing, the Court will deduct only half this amount ($496.59) because "[m]any, if not all, of the board members returned their binders to Maddox and Holler following the administrative hearing," so the documents were later used "as exhibits for depositions and various pleadings, and copies of documents from these binders [were] used at the hearing requested on Edge's *Verified Petition*." (Filing No. 73 at 20.) And second, though the Board challenged some amounts spent after August 13, 2018, as vague or inappropriate (*see* Filing No. 72 at 19), Edge sufficiently explained their provenance and propriety (*see* Filing No. 73 at 19–20 (clarifying "vague entries" an allegedly unnecessary expenses). Altogether, Edge is owed $8,717.53 in expenses ($9,246.12 less $528.59 (expenses incurred before August 13, 2018, and half the cost of the above-discussed binders)) (*see* Filing No. 76-3 at 1–2).

## III.  CONCLUSION

In sum, the Court enters judgment in favor of Plaintiff Jessica H. Edge and against Defendant Board of School Trustees of the Salem Community School Corporation for **$356,022.64**, consisting of: (1) $80,625.81 in equitable economic remedies for back pay and benefits, (2) $9,919.59 in prejudgment interest from August 13, 2018, to the date of judgment, (3) $90,545.40 in liquidated damages, (4) $166,214.31 in attorneys' fees, and (5) $8,717.53 for counsel's expenses.

**SO ORDERED.**

Date:  7/29/2021

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Jamie A. Maddox
BETZ & ASSOCIATES
jmaddox@betzadvocates.com

Kevin W. Betz
BETZ & BLEVINS
kbetz@betzadvocates.com

Sandra L. Blevins
BETZ & ASSOCIATES
sblevins@betzadvocates.com

Sara R. Blevins
LEWIS & KAPPES PC
sblevins@lewis-kappes.com